**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ERIC HONEYFIELD**,

Plaintiff,

vs. No. 08CV1034 MCA/GBW

**CITY OF GALLUP,**

Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant City of Gallup's *Motion for, and Memorandum in Support of, Summary Judgment* [Doc. 28], filed November 16, 2009. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

## I. BACKGROUND

The following facts are viewed in a light most favorable to the non-movant, Plaintiff Eric Honeyfield, and all reasonable inferences are drawn in his favor. See Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1142 (10th Cir. 2009).

At all times relevant to this action, Eric Honeyfield was employed by Defendant City of Gallup ("City") as its City Manager. On Friday, March 30, 2007, one day after Harry Mendoza was sworn in as Gallup's new mayor, Mr. Honeyfield received a telephone call from Mayor Mendoza, during which the mayor asked whether Councilman Bill Nechero could be hired as Assistant City Manager. [Doc. 28 at 2]. As of March 30, 2007, the position

of Assistant City Manager apparently did not yet exist, but its creation was being contemplated. [See Doc. 28 at 3 (explaining that, "shortly after" this telephone call, the City Council "took up the issue of whether there should be an assistant city manager.")]. In any event, Mr. Honeyfield expressed concerns over Councilman Nechero's qualifications, and also explained to the mayor that the City was subject to a federal consent decree that prohibited the preselection of candidates for municipal positions. [Id.]. The mayor then put Councilman Nechero on the phone with Mr. Honeyfield, who explained the assistant manager position and qualifications directly to Mr. Nechero. It is undisputed that Councilman Nechero then "declined any interest in the position." [Id.].

In notes that appear to have been prepared contemporaneously with this telephone call, Mr. Honeyfield states:

> *I offered to resign*; given loyalty to staff that I had promoted that may not be consistent with his goals, and the violation of the DOJ consent Decree that preselection of people for positions causes. I stated that I would stay until the end of May to get the budget done and all I wanted was the 6 months severance pay per my Contract. *He responded that he would take the week end to think about it.*

[Doc. 28; Exh. B (emphasis added)]. According to Mr. Honeyfield, the following Monday, April 2, 2007, Mayor Mendoza told him that "everything was fine," although Mr. Honeyfield described the mayor as being "a little bit chilly, a little bit icy" toward him. At that point, however, Mr. Honeyfield decided to "see how it goes." [Id.; Exh. A, Honeyfield depo. at 26].

Also in April 2007, the Gallup City Council met in executive session to discuss, among other things, the creation of the position of Assistant City Manager. According to

Councilman Pat Butler, the consensus at that meeting was that there was no need for an Assistant City Manager, and that "the mayor saw that . . . at that juncture, the council was not willing to expand the workforce. . . ." [Doc. 28; Exh. D, Butler depo. at 17]. By the end of the meeting, Councilman Butler considered the issue of the hiring of an Assistant City Manager to be a dead one. [Id.]. Councilman Allan Landavazo also was present at the executive session and also believed that, by the end of the meeting, the issue of hiring an Assistant City Manager was dead. According to Councilman Landavazo, the City lacked the money and the workload for the creation of the position of Assistant City Manager and, therefore, "the general consensus [was] that it shouldn't be done." [Id.; Exh. E, Landavazo depo. at 14]. Even Mr. Honeyfield, himself present during the executive session, believed that the issue no longer was viable, "the council [having] pretty much . . . chosen not to create the position of assistant city manager." [Id.; Exh. A, Honeyfield depo. at 105-106]. Indeed, after the April executive session, Mr. Honeyfield "heard nothing else about [the issue of the creation of the Assistant City Manager position]." [Id.].

Some months later, on Friday, June 8, 2007, Mr. Honeyfield and Mayor Mendoza were discussing a matter wholly apart from the issue of the Assistant City Manager—the reason a new hire had failed to appear for his first day of work. [Doc. 28 at 4]. When the mayor asked why the employee had not shown, Mr. Honeyfield replied that he did not know, but that he would find out. [Id.; Exh. C. Mendoza depo. at 20]. Mr. Honeyfield subsequently informed the mayor that the employee actually had declined the position, and that the mayor "ha[d] Mary Ann Armijo to thank for that." [Id.]. According to Mayor Mendoza, "that's

when [he] did a slow burn. . . ." [Id.].

It is undisputed that Mary Ann Armijo is a former councilwoman for the City of Gallup, and that Mayor Mendoza did not want her "having anything to do with the running [of] the City" during his term. [Doc. 28 at 4; Exh. C, Mendoza depo. at 21]. It also is undisputed that Ms. Armijo and Mr. Honeyfield were rumored to be having an affair. [Id. at 4]. Finally, it is undisputed that, at the mention of Ms. Armijo's name, Mayor Mendoza "became angry." [Id.].

After considering this exchange, Mayor Mendoza, who was without authority to unilaterally terminate Mr. Honeyfield, decided to ask Mr. Honeyfield for his resignation and, toward that end, spoke to Councilmen Butler, Landavazo, and Jay Azua. [Doc. 28; Exh. A, Honeyfield depo. at 9; Exh. C, Mendoza depo. at 21]. According to Councilman Butler, Mayor Mendoza told him that "he could just not work with [Mr. Honeyfield and] that he wanted to go ahead and get another City Manager." [Id.; Exh. D, Butler depo. at 8]. However, Mayor Mendoza did "not directly" say *why* he could not work with Mr. Honeyfield. [Id.; Exh. D, Butler depo. at 9]. Councilman Landavazo does not remember Mayor Mendoza stating that he was prepared to request Mr. Honeyfield's resignation, but he does recall that the mayor "made general statements that he wasn't happy with [Mr. Honeyfield's] performance. . . ." [Id.; Exh. E, Landavazo depo. at 15]. More specifically, Councilman Azua remembers that Mayor Mendoza told him that "'the City Manager [was] ignoring [the mayor's] advice and asking advice from the previous administration[,]'" to which Councilman Azua responded, "[t]hat is not a good thing." [Id.; Exh. I, Azua depo. at

15]. According to Mr Honeyfield, that same day, Friday, June 8, 2007, Councilmen Butler and Landavazo telephoned to notify him that he was "probably going to be fired on Monday." [Id.; Exh. A, Honeyfield depo. at 51]. While it is undisputed that Mr. Honeyfield believed from these conversations that Councilmen Butler and Landavazo would support him if the issue of his termination came up for a vote, he testified through his deposition that he nevertheless made the decision on Sunday, June 10, 2007, to submit his letter of resignation. [Id. at 7; Exh. A, Honeyfield depo. at 51-52; 104-105].[1]

It therefore is undisputed that Mr. Honeyfield's decision to submit his letter of resignation was made *before* Mayor Mendoza approached him on Monday, June 11, 1007, and asked for his resignation, telling him also that "he had the votes to fire" Mr. Honeyfield. [Doc. 28 at 8]. It also is undisputed that, after the mayor asked for his resignation, Mr. Honeyfield "negotiated the issue of severance. . . ." [Id.]. Mr. Honeyfield did not, however, ask to keep his job. [Id.; Exh. A. Honeyfield depo. at 76]. Finally, it is undisputed that Mr.

[1] Mr. Honeyfield himself confirmed that he made the decision to submit his letter of resignation before he spoke to Mayor Mendoza on Monday June 11, 2007:

Q: When you got the phone call—or phone calls from Councilors Butler and Landavazo on the afternoon of June 8th—those were the two who called you, correct?
A: Yes.
Q: Did you decide that day to submit a resignation letter?
A: No.
Q: When did you make that decision?
A: It would have been Sunday.
Q: Sunday?
A: *I made it before that Monday.*

[Doc. 28; Exh. A, Honeyfield depo. at 104-105 (emphasis added)].

Honeyfield knew that he could have forced a public hearing on the issue of his termination, having undergone two such hearings during previous employment with the City of Raton. [Id.; Exh. A. Honeyfield depo. at 97-99].

On October 31, 2008, Mr. Honeyfield filed a civil rights *Complaint* against the City of Gallup, alleging that he was subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* "because he opposed an unlawful discriminatory practice." [Doc. 1 at 2]. More specifically, Mr. Honeyfield contends that he was retaliated against when he refused to hire Councilman Nechero for the position of Assistant City Manager, and that he was terminated when he would not violate the consent decree. [Doc. 31 at 1-2].[2]

On November 16, 2009, the City filed its *Motion for, and Memorandum in Support of, Summary Judgment*. [Doc. 28]. In its motion, the City argues that any claim of retaliation fails as a matter of law because Mr. Honeyfield can demonstrate no causal connection between the alleged protected activity and the alleged adverse employment action. [Id. at 9-12]. Instead, maintains the City, it had an entirely legitimate reason for seeking Mr. Honeyfield's resignation, *i.e.*, that Mr. Honeyfield was discussing city business with Mary

[2] To the extent that Mr. Honeyfield originally had also claimed that "[w]hile employed by the City, [he] was a victim of discrimination with respect to his compensation, terms, conditions, and privileges of employment, because of his race, color and national origin[,]" [Doc. 1 at 2], the Court concludes that this claim has since been waived. [See Doc. 28; Exh. A, Honeyfield depo. at 92 (confirming that Mr. Honeyfield is not alleging discrimination on the basis of color, age, sex, disability status, religion, or national origin)]. See United States v. Carrasco-Salazar, 494 F.3d 1270, 1272 (10th Cir. 2007) (distinguishing "waiver" from "forfeiture").

Ann Armijo. [See id. at 14]. Additionally, the City points out that Mr. Honeyfield resigned his position and, because he cannot demonstrate that his resignation amounted to a constructive discharge, he cannot show that he suffered an adverse employment action. [Id. at 16-17].

## II. ANALYSIS

### A. Defendant City of Gallup's *Motion for, and Memorandum in Support of, Summary Judgment* [Doc. 28]

#### 1. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not

necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**2. Title VII, 42 U.S.C. § 2000e, *et seq.***

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids. . . ." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (*quoting* 42 U.S.C. § 2000e-3(a)). Where a plaintiff provides no direct evidence of such retaliation, the Court analyzes his claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Annett v. Univ. of Kansas, 371 F.3d 1233, 1237 (10th Cir. 2004). Under the burden-shifting framework, the plaintiff must first present a prima facie case of retaliation, which then shifts the burden to the defendant to produce a legitimate, nondiscriminatory justification for taking the disputed employment action. If the defendant satisfies this standard, the burden shifts back to the plaintiff to provide evidence showing that the defendant's proffered reasons are pretextual. Id.

In order to make out his prima facie case of retaliation, Mr. Honeyfield must demonstrate (1) "protected opposition" under § 2000e-3(a); (2) an adverse employment

action against him; and (3) a causal connection between the "protected opposition" and the adverse employment action. See Zokari v. Gates, 561 F.3d 1076, 1081 (10th Cir. 2009). If the City then produces a legitimate, nondiscriminatory justification for taking the alleged employment action, Mr. Honeyfield will survive summary judgment only if he "demonstrate[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in [the City's] proffered reasons 'that a reasonable factfinder could rationally find them unworthy of credence.'" Anderson v. AOL, LLC, 2010 WL 299256, at *4 (10th Cir. Jan. 27, 2010) (*quoting* Medina v. Income Support Div., New Mexico, 413 F.3d 1131, 1136 (10th Cir. 2005)).

In this case, it is undisputed that Mr. Honeyfield resigned his position as City Manager. However, he insists that, for purposes of Title VII, he was terminated, and asks "at [what] point has the employer given the employee sufficient notice that [his] job is over to make it an actionable discharge?" [Doc. 31 at 5].

While "[a]n *actual* discharge does not occur . . . when the employee chooses to resign rather than work under undesirable conditions[, a resigning employee] may still satisfy the adverse employment action requirement by demonstrating that he was *constructively* discharged." Fischer v. Forestwood Co., Inc., 525 F.3d 972, 980 (10th Cir. 2008) (emphasis added). Still, the plaintiff's burden in establishing a constructive discharge is substantial, and the bar is quite high, since the plaintiff must show that "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." Garrett v. Hewlett-Packard Co., 305

F.3d 1210, 1221 (10th Cir. 2002) (internal quotations omitted). Put more bluntly, "a plaintiff must show he had no other choice but to quit." Id.

To support a claim of constructive discharge, the plaintiff must show that working conditions were intolerable, *not* just that they were difficult or unpleasant. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). The Tenth Circuit has held that even requiring an employee to choose between resignation and termination is not necessarily a constructive discharge, "unless the employee's decision is, for some reason, involuntary." Id. Accordingly, the plaintiff bears the burden of showing that "at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." Id.

The voluntariness of an employee's resignation is assessed under an objective standard. Exum, 389 F.3d at 1135. Factors to consider in determining voluntariness include whether the employee (1) was given an alternative to resignation; (2) understood the nature of the choice he was given; (3) was given a reasonable time in which to choose, and (4) could select the effective date of resignation. Lenz v. Dewey, 64 F.3d 547, 552 (10th Cir. 1995).

**a. Adverse Employment Action: Actual Discharge**

Assuming without deciding that Mr. Honeyfield has demonstrated that he participated in "protected opposition" under § 2000e-3(a), he must still show that he was subjected to an adverse employment action as a result of his participation in the protected opposition. See Zokari 561 F.3d at 1081. The Court concludes that Mr. Honeyfield has failed to demonstrate that he was subjected to an adverse employment action through actual discharge. Although

Mr. Honeyfield argues that "[t]he mayor clearly communicated to [him] that he had sufficient votes to fire him[, and that t]his is evidence of actual termination[,]" [Doc. 31 at 7], it is undisputed that Mr. Honeyfield resigned. [Doc. 28 at 5 ("On [June 11, 2007], Honeyfield tendered his letter of resignation."); see also Exh. A, Honeyfield depo. at 104-105 (explaining that two days after having spoken to Councilmen Butler and Landavazo, Mr. Honeyfield made the decision to submit his resignation letter)]. The Tenth Circuit has expressly held that "[a]n actual discharge does not occur . . . when the employee chooses to resign rather than work under undesirable conditions." Fischer, 525 F.3d at 980 ("In sum, because [plaintiff] chose to resign rather than work for a company he believed had wronged [a co-worker], we agree with the district court that he was not actually discharged."). The critical question for this Court, then, becomes whether Mr. Honeyfield has satisfied his burden of demonstrating that he was constructively discharged.

**b. Adverse Employment Action: Constructive Discharge**

For a number of reasons, the Court similarly concludes that Mr. Honeyfield has not shown that he was constructively discharged as a result of having participated in "protected opposition" under § 2000e-3(a), or that he was constructively discharged at all. See Zokari 561 F.3d at 1081. Again, notwithstanding Mr. Honeyfield's allegations that (1) Mayor Mendoza "clearly communicated" to him that he had sufficient votes to fire him; (2) the circumstances of Mr. Honeyfield's departure were "clearly instigated" by the mayor; and (3) "the message to [Mr. Honeyfield] was clear [that] he would no longer work for the City of Gallup[,]" Mr. Honeyfield's evidence falls short of evidence tending to show that his

working conditions had become so intolerable that a reasonable employee in his position would have felt compelled to quit. See Garrett, 305 F.3d at 1221.

Rather than demonstrate that Mr. Honeyfield had no choice other than to tender his resignation, the undisputed evidence shows that Mr. Honeyfield knew that (1) the mayor could not unilaterally terminate him; (2) the matter of his termination would have to be put to a full City Council vote; (3) council meetings took place the second and fourth Tuesdays of the month; (4) the matter could not be put to a vote unless it was first listed on a published agenda; (5) the matter was not on the agenda for the next meeting following Friday, June 8, 2007 (when Mr. Honeyfield came to believe from Councilmen Butler and Landavazo that he was "probably going to be fired on Monday"); (6) the earliest a vote on the matter of Mr. Honeyfield's termination could have been taken would have been either at the Tuesday, June 26, 2007 meeting, or at a specially scheduled council meeting; and (7) at the time Mr. Honeyfield tendered his resignation, he was aware of no specially scheduled council meeting. [Doc. 28; Exh. A, Honeyfield depo. at 9, 50-55]. Mr. Honeyfield also believed that he had the support of at least two of the five voting council members. [Id.; Exh. A, Honeyfield depo. at 39, 51-52]. Additionally, Mr. Honeyfield knew, from his past experience as an employee of the City of Raton, that he could insist on a public termination, at which he could request legal counsel. [Id.; Exh. A, Honeyfield depo. at 97-99].

It also bears repeating that Mr. Honeyfield himself testified through his deposition that it was Sunday, June 10, 2007, when he decided to submit his letter of resignation. [Doc. 28; Exh. A, Honeyfield depo. at 105 ("Q: When did you make that decision [to submit a

resignation letter? A: It would have been Sunday.")]. Mayor Mendoza met with Mr. Honeyfield and requested his resignation the next day, Monday, June 11, 2007. [See Doc. 28 at 8 ("On . . .Monday, June 11, the Mayor came into Honeyfield's office. The Mayor told him that he had the votes to fire Honeyfield, . . . then said he would like Honeyfield's resignation."); Doc. 31 at 7 ("Monday [June 11, 2007], the mayor came into [Mr. honeyfield's] office and said: 'I've got sufficient votes, if I need to, to fire you. I'd like to have a resignation from you.'")]. Thus, Mr. Honeyfield had made the decision to resign *the day before* Mayor Mendoza asked him to do so.

That Mr. Honeyfield chose to resign (1) before speaking to the mayor; (2) believing that he had the support of at least two of the five voting members of the City Council; (3) knowing that he could force a full City Council vote on the matter; and (4) knowing also that he could insist on a public termination, at which he would be entitled to legal representation, indicates that his decision was voluntary inasmuch he understood the nature of his options. See Lenz, 64 F.3d at 552. That Mr. Honeyfield understood the nature of the choice presented to him also is borne out by the fact that he successfully negotiated six months' of severance pay for himself. [See Doc. 28 at 8]. Additionally, Mr. Honeyfield knew that the earliest a vote on the matter could have been taken would have been either at the Tuesday, June 26, 2007 City Council meeting, or at a meeting that would have to be specially scheduled. See Lenz, 64 F.3d at 552. (factors considered in assessing voluntariness of resignation include whether employee was given a reasonable time in which to choose among options, and he was allowed to select effective date of resignation.).

The Court determines that Mr. Honeyfield has not shown that he did not voluntarily resign or that he was denied "the opportunity to make a free choice regarding his employment relationship." Exum, 389 F.3d at 1135. Consequently, the Court concludes that Mr. Honeyfield has failed to demonstrate that he was subjected to an adverse employment action through constructive discharge. Because Mr. Honeyfield has not shown that he was subjected to an adverse employment action (either actual or constructive discharge), he has failed to make his prima facie case of Title VII retaliation.

**c. Whether the City has Produced a Legitimate, Nondiscriminatory Justification for its Action**

In the alternative, even assuming that Mr. Honeyfield were able to make his prima facie case of retaliation, the Court concludes that the City has produced a legitimate, nondiscriminatory justification for its action, which Mr. Honeyfield has failed to demonstrate as pretextual. See Annett, 371 F.3d at 1237.

In this case, the City submits that the reason it opted not to retain Mr. Honeyfield as its City Manager is that Mayor Mendoza came to believe that Mr. Honeyfield was discussing city business with former Councilwoman Mary Ann Armijo. [Doc. 28 at 4]. Because the mayor did not want Ms. Armijo involved in "the running [of] the city" during his term, he became angry, "did a slow burn[,] thought about it[,]" and ultimately decided to seek Mr. Honeyfield's resignation. [Id.; Exh. C, Mendoza depo. at 20-21]. Mr. Honeyfield responds that this proffered justification must be pretextual because Mayor Mendoza cited Mr. Honeyfield's alleged poor performance—*not* his association with Ms. Armijo—in the

conversations he had with City Council members, and yet at least two of those members (Councilmen Butler and Landavazo) "believed that [Mr. Honeyfield's] performance was exemplary." [Doc. 31 at 11]. From this, Mr. Honeyfield concludes that he must have been asked to resign because of his refusal to violate the consent decree and hire Councilman Nechero as Assistant City Manager. [See id.].

In order to survive summary judgment, Mr. Honeyfield must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the City's] proffered reason . . . that a reasonable factfinder could rationally find them unworthy of credence. Medina, 413 F.3d at 1136. Still, it is not the Court's role "to act as a 'super personnel department' that second guesses employers' business judgments." Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999). Rather, the Court's role is to prevent unlawful employment practices. Id. Thus, the "relevant inquiry is not whether [the City's] proffered reasons were wise, fair or correct, but whether [the City] honestly believed those reasons and acted in good faith upon [its] beliefs." Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004). The City's reason need not have been good or prudent; "[i]t simply has to [have been] nondiscriminatory." See Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 20 (7th Cir. 1987), overruled on other grounds by Coston v. Plitt Theatres, Inc., 860 F.2d 834 (7th Cir. 1988).

In this case, it is undisputed that the matter of the creation of the position of Assistant City Manager had been laid to rest by April 2007. Mr. Honeyfield himself believed this to be the case and explained that, after the April executive session, he "heard nothing else about

[the issue of the creation of the Assistant City Manager position].” [Id.; Exh. A, Honeyfield depo. at 105-106].

It also is undisputed that two months later, in June, Mayor Mendoza became angry because he believed that Mr. Honeyfield had been discussing city business with former councilwoman Mary Ann Armijo, and the mayor did not want Ms. Armijo involved in “the running [of] the city” during his term. [Doc. 28, Exh. C, Mendoza depo. at 21]. Indeed, at least one councilmember to whom the mayor spoke about Mr. Honeyfield remembers the mayor stating that Mr. Honeyfield was “ignoring [the mayor’s] advice and asking advice from the previous administration.” [Id.; Exh. I, Azua depo. at 15]. This councilmember replied that “[t]hat [was] not a good thing.” [Id.].

Although Mr. Honeyfield contends that, after his March 30, 2007 telephone conversation with the mayor the mayor became “chilly,” “icy,” and “non-committal,” [see Doc. 31 at 9], he also has stated that, after he explained the consent decree to the mayor and the reason he was not in favor of making Councilman Nechero Assistant City Manager, the mayor’s response was that “everything was fine.” [Doc. 28, Exh. A, Honeyfield depo. at 26]. While he maintains that assertions regarding his alleged poor performance were unsubstantiated and, therefore, pretextual, these allegations are conclusory, with nothing in the record to support a determination that any such assertions were motivated by a retaliatory animus. See Parker v. Housing Auth. of Kansas City, Kan., 1993 WL 2074411, at *4 (10th Cir. June 9, 1993) (allegations that (1) fellow board members made remarks indicating desire to remove plaintiff from his position, and (2) plaintiff displayed poor work habits, did not

establish pretext where such remarks were conclusory and lacking in evidence that they were "in any way motivated by racial animus").

Lastly, Mr. Honeyfield's insistence that the stated reason for requesting his resignation masks the City's retaliatory motive is undercut by the fact that during the March 30, 2007 conversation between Mr. Honeyfield and Mayor Mendoza about Council Nechero and the Assistant City Manager position, Mr. Honeyfield tendered an offer to resign, which the mayor at that time declined As Mr. Honeyfield's notes memorializing the March 30, 2007 conversation with mayor Mendoza reflect, he offered to resign right then (effective two months later and with six months' severance pay), but that the mayor "responded that he would take the weekend to think about it." [Doc. 28; Exh. B]. It was more than *two months* after this conversation regarding Councilman Nechero—but only *two days* after Mayor Mendoza began "a slow burn" over former Councilwoman Armijo—that the mayor asked Mr. Honeyfield for his resignation. The Court concludes that Mr. Honeyfield has not demonstrated that the proffered reason for requesting his resignation was pretextual.

**III. CONCLUSION**

For the reasons set forth more fully above, the Court concludes that Mr. Honeyfield is unable to demonstrate a prima facie case of retaliation under Title VII because he has not shown that he was subjected to an adverse employment action. Alternatively, even if Mr. Honeyfield had made his prima facie case, the City has produced a legitimate, nondiscriminatory justification for its actions, which Mr. Honeyfield has failed to expose as pretextual. Accordingly, the Court will grant the City's summary-judgment motion.

**IT IS, THEREFORE, ORDERED** that Defendant City of Gallup's *Motion for, and Memorandum in Support of, Summary Judgment* [Doc. 28] is **GRANTED**;

**IT IS FURTHER ORDERED** that the Pretrial Conference, set for Tuesday, March 2, 2010; the Call of the Calendar, set for Thursday, April 8, 2010; and the Jury Selection/Trial, set for Monday, April 12, 2010 are hereby **VACATED**.

**SO ORDERED** this 17th day of February, 2010, in Albuquerque, New Mexico.

______________________________
**M. CHRISTINA ARMIJO**
United States District Judge